OPINION
 

 CHARLES R. SCOTT, Senior District Judge.
 

 This is an action challenging the constitutionality of Florida Statutes § 812.049 and § 812.051 (1981), effective October 1, 1981.
 
 [1]
 
 These statutes are aimed at regulating Florida’s secondhand precious metal businesses.
 
 [2]
 
 They impose numerous restrictions and prohibitions upon persons transacting purchases or sales of secondhand precious metals, including: (1) a requirement that dealers keep detailed records of each purchase transaction, including a photograph or fingerprint of the seller; (2) a requirement that purchased goods be retained within the county in an unaltered condition by the dealer for a period of 15 days following the transaction; (3) a requirement that the dealer submit all records of purchase transactions to the county sheriff and municipal police department within 24 hours of the transactions; (4) a provision that the dealers’ records shall be subject to inspection by all law enforcement officers and shall be preserved for a period of three years; (5) a provision prohibiting a dealer from purchasing any item of precious metal from a person under the age of 18 years.
 
 *1003
 
 Failure to comply with the provisions of the statutes constitutes a first degree misdemeanor.
 

 Plaintiffs are engaged in the interstate and intrastate business of buying and selling precious metals, junk, coins, scrap metal and jewelry.
 
 [3]
 
 Defendants are the Florida Attorney General and various sheriffs and deputy sheriffs charged with enforcing the laws of the state of Florida in the geographic area surrounding plaintiffs’ businesses.
 

 In Count I of the complaint, plaintiffs seek a temporary restraining order, preliminary injunction and declaratory relief. Count II is a claim under 42 U.S.C. § 1983 against defendants Ronald K. Graffis, a deputy sheriff of Lake County, Florida, and G. W. Simpson, a deputy sheriff of Citrus County, Florida. The Section 1983 claim is grounded in the allegation that the defendants Graffis. and Simpson have informed plaintiffs that the challenged statutes will be enforced against them.
 

 ABSTENTION
 

 By order entered October 20, 1981, plaintiffs’ motion for a temporary restraining order was denied. A hearing on the application for preliminary injunction was held November 6, 1981, at which time the Court raised the threshold question of whether the
 
 Pullman
 
 abstention doctrine is properly applicable to this case.
 
 Railroad Commission of Texas v. Pullman,
 
 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). The parties had been directed in the order denying plaintiffs’ motion for a temporary restraining order to arrive at the preliminary injunction hearing prepared to argue the applicability or non-applicability of the
 
 Pullman
 
 doctrine. Having considered the matter thoroughly, the Court is convinced that it should not abstain from hearing and deciding this matter.
 

 The law is clear that a federal court should abstain from deciding a case in which a state statute is challenged as unconstitutional where resolution of an unsettled question of state law would eliminate or materially alter the federal constitutional question.
 
 Procunier v. Martinez,
 
 416 U.S. 396, 402, 94 S.Ct. 1800,1806, 40 L.Ed.2d 224 (1974);
 
 Harman v. Forssenius,
 
 380 U.S. 528, 534, 85 S.Ct. 1177, 1181, 14 L.Ed.2d 50 (1965);
 
 see generally
 
 17
 
 A. Wright & C. Miller, Federal Practice and Procedure
 
 § 4242 (1978).
 

 The essential prerequisite to the applicability of
 
 Pullman
 
 abstention is the existence of “an unsettled question of state law” that, if resolved, would avoid the need for a federal constitutional adjudication.
 
 Procunier v. Martinez, supra,
 
 416 U.S. at 402, 94 S.Ct. at 1806. Where this essential element is absent, abstention is not a proper course to adopt. As the Supreme Court stated in
 
 Harman v. Forssenius, supra:
 

 The doctrine, however, contemplates that deference to state court adjudication only be made where the issue of state law is uncertain, [citing eases] If the state statute in question, although never interpreted by a state tribunal, is not fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question, it is the duty of the federal court to exercise its properly invoked jurisdiction, [citing case] Thus, ‘recognition of the role of state courts as the final expositors of state law implies no disregard for the primacy of the federal judiciary in deciding questions of federal law.’
 

 380 U.S. at 534-35, 85 S.Ct. at 1181-82,
 
 quoting England v. Louisiana State Board of Medical Examiners,
 
 375 U.S. 411, 415-16, 84 S.Ct. 461, 464-65, 11 L.Ed.2d 440 (1964).
 

 In the case
 
 sub judice,
 
 the challenged statutes, copies of which are attached hereto as Appendix A, are attacked on several grounds as being violative of the federal constitution. It is alleged that the statutes violate,
 
 inter alia,
 
 the interstate commerce clause, the Fourth Amendment guarantee
 
 *1004
 
 against unreasonable search and seizure, the Fifth Amendment protection against compelled self-incrimination, and the equal protection and due process clauses of the Fourteenth Amendment.
 

 This is not a case that turns upon the construction or clarification of a particular question of state law, the resolution of which would obviate the need for a federal constitutional adjudication. The defendants have not pointed to any provision in the legislation which leaves “reasonable room for a construction by the . . . [Florida] courts which might avoid in whole or in part the necessity for federal constitutional adjudication, or at least materially change the nature of the problem.”
 
 Harman v. Forssenius, supra,
 
 380 U.S. at 536, 85 S.Ct. at 1182,
 
 quoting Harrison v. NAACP,
 
 360 U.S. 167, 177, 79 S.Ct. 1025, 1030, 3 L.Ed.2d 1152 (1959).
 

 The plaintiffs have raised manifold doubts as to the constitutionality of the challenged statutes. The alleged infirmities, which pervade the entire content of the legislation, strike at the very heart of the Constitution. It would be impossible, in the Court’s opinion, to construe the statutes in a way that would avoid the necessity of ruling upon the constitutional questions raised in the plaintiffs’ complaint.
 

 Defendants contend that abstention is mandatory simply because one prong of the constitutional attack on the statutes is that they are void for vagueness under the due process clause of the Fourteenth Amendment. Apparently, defendants construe
 
 Harman v. Forssenius, supra,
 
 as mandating abstention whenever there is a vagueness challenge to a state statute. That case does not stand for any such proposition. The question of whether or not
 
 Pullman
 
 abstention is appropriate in actions attacking a state statute on vagueness grounds was discussed in
 
 Baggett v. Bullitt,
 
 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964).
 

 In
 
 Baggett,
 
 the Supreme Court distinguished two types of vagueness challenges. Where the question is whether the statute is applicable to a particular person or a well defined course of conduct, abstention may be appropriate because a single state decision could possibly resolve the ambiguity. Where, however, the statute is challenged on the basis that persons to whom it clearly applies cannot understand what is required of them and do not wish to refrain from all activity arguably within the purview of the vague terms, abstention is not required. 377 U.S. at 378, 84 S.Ct. at 1326.
 

 It is unnecessary, however, to decide into which of these categories the instant vagueness challenge fits, for the Supreme Court has made it clear that where the challenged statute is constitutionally deficient for some reason other than, or in addition to, vagueness, the fact that it may also be vague does not require that a district court abstain from hearing the case.
 
 Procunier v. Martinez, supra,
 
 was a class action challenging state regulations relating to the censorship of prisoners’ incoming and outgoing mail. One of the grounds raised by plaintiffs was that the regulations were void for vagueness. The defendants contended that whenever there is a vagueness challenge to an uninterpreted state statute or regulation, the case is a proper one for abstention. After noting that not every vagueness attack upon a state statute or regulation warrants abstention (discussing
 
 Baggett v. Bullitt, supra),
 
 the court went on to state:
 

 But we need not decide whether appellants’ contention is controlled by the analysis in
 
 Baggett,
 
 where the short answer to their argument is that these regulations were neither challenged nor invalidated solely on the ground of vagueness. Appellees also asserted, and the District Court found, that the rules relating to prisoner mail permitted censorship of constitutionally protected expression without adequate justification. In light of the successful First Amendment attack on these regulations, the District Court’s conclusion that they were also unconstitutionally vague hardly ‘constitutes a compelling reason for abstention.’
 

 Id.
 
 at 402, 94 S.Ct. at 1806. Thus, the fact that certain provisions of a challenged stat
 
 *1005
 
 ute may be unconstitutionally vague is not an adequate justification for a federal court to abstain from ruling upon the matter where other provisions of the statute are violative of the federal constitution on grounds independent of vagueness. As will be discussed in greater detail
 
 infra,
 
 this is precisely the situation presented by Florida Statutes § 812.049 and § 812.051. Consequently, the
 
 Pullman
 
 abstention doctrine is not applicable.
 

 The
 
 Pullman
 
 doctrine was founded upon notions of federalism. Federal courts, observed the Supreme Court, should refrain from exercising their authority in constitutional cases involving unsettled questions of state law, out of “scrupulous regard for the rightful independence of the state governments.”
 
 Railroad Commission of Texas v. Pullman Company, supra,
 
 312 U.S. at 501, 61 S.Ct. at 645.
 

 A variation of the
 
 Pullman
 
 abstention doctrine, also growing out of concern for the proper working relationship between federal and state governments, is the rule precluding federal courts from enjoining state criminal prosecutions. This rule, first enunciated in
 
 Younger v. Harris,
 
 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), holds that, unless bad faith enforcement or other special circumstances are present, principles of equity, comity and federalism operate to preclude a federal court from entering an injunction restraining enforcement of a state criminal statute when a state prosecution is pending. 401 U.S. at 54, 91 S.Ct. at 755;
 
 Samuels v. Mackell,
 
 401 U.S. 66, 69, 91 S.Ct. 764, 766, 27 L.Ed.2d 688 (1971);
 
 Steffel v. Thompson,
 
 415 U.S. 452, 454, 94 S.Ct. 1209, 1213, 39 L.Ed.2d 505 (1974). Subsequent cases have made it clear, however, that in the absence of a pending state criminal proceeding, the considerations stressed in
 
 Younger v. Harris
 
 carry little force.
 

 In
 
 Steffel v. Thompson, supra,
 
 the Supreme Court held that federal declaratory relief was properly granted to plaintiffs challenging a state criminal statute as unconstitutional where no state prosecutions were pending against them. All that is required is that the federal plaintiff estab-
 

 lish a genuine threat that the statute will be enforced against him. 415 U.S. at 475, 94 S.Ct. at 1223. The Court did not decide whether preliminary injunctive relief would have been appropriate under the facts in
 
 Steffel,
 
 although it did discuss the distinctions between declaratory and injunctive relief, concluding that it is unnecessary for a plaintiff to demonstrate irreparable injury prior to obtaining declaratory relief. 415 U.S. at 471, 94 S.Ct. at 1221. While the Court expressed its opinion that declaratory relief will generally have a less intrusive effect upon the administration of state criminal law than injunctive relief, it has previously observed that “[ojrdinarily . . . the practical effect of the two forms of relief will be virtually identical . .. . ”
 
 Samuels v. Mackell, supra,
 
 401 U.S. at 73, 91 S.Ct. at 768.
 

 The question reserved in
 
 Steffel
 
 was resolved in
 
 Doran v. Salem Inn,
 
 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975), an action challenging an ordinance making it unlawful for bar owners to permit topless dancing in their establishments. Each of the three plaintiffs in
 
 Doran
 
 operated bars that provided topless dancing as entertainment. Upon enactment of the ordinance, all three plaintiffs ceased the topless dancing activities at their respective establishments and instituted suit in federal court, challenging the ordinance on First and Fourteenth Amendment grounds. One of the plaintiffs, however, resumed its presentation of topless dancing the day after the complaint was filed. Criminal proceedings were immediately instituted against the offending plaintiff.
 

 A few days after those criminal proceedings were commenced, the federal district court entered an injunction restraining the defendants from enforcing the ordinance against
 
 any
 
 of the plaintiffs, finding that the ordinance was facially invalid under the First Amendment. That order was affirmed by the Second Circuit Court of Appeals.
 

 The Supreme Court reversed the court of appeals’ decision approving the granting of injunctive relief to the plaintiff against whom criminal proceedings had been instituted, relying upon
 
 Younger v. Harris, su
 
 
 *1006
 
 pra, but affirmed as to the other two plaintiffs. With respect to these latter two plaintiffs, that is, those who were not subject to state criminal prosecutions, the Court commenced its analysis by concluding that under the holding in
 
 Steffel, supra,
 
 they were clearly entitled to
 
 declaratory
 
 relief. 422 U.S. at 930, 95 S.Ct. at 2567.
 

 The Court then proceeded to consider the question left open in
 
 Steffel,
 
 i.e., whether
 
 injunctive
 
 relief is available to plaintiffs challenging a state criminal statute when criminal prosecution has been threatened, but has not yet been instituted. The Court answered the question affirmatively, determining that “. . . unless preliminary relief is available upon a proper showing, plaintiffs in some situations may suffer unnecessary and substantial irreparable harm.” 422 U.S. at 931, 95 S.Ct. at 2567. In
 
 Doran,
 
 the Court found the allegation of plaintiffs that they would suffer substantial loss of business and possible bankruptcy if forced to comply with the ordinance to be sufficient showing of irreparable harm, thereby justifying preliminary injunctive relief. 422 U.S. at 931, 95 S.Ct. at 2567.
 

 Applying the law emanating from
 
 Younger v. Harris, supra,
 
 and the line of cases succeeding it, to the case at bar, the Court is of the opinion that plaintiffs are entitled to preliminary injunctive relief, provided they satisfy the four requisites set forth in
 
 Canal Authority of State of Florida v. Callaway,
 
 489 F.2d 567 (5th Cir. 1974). There is no dispute that a genuine threat of prosecution under the challenged statutes exists with respect to the plaintiffs. Plaintiffs allege in their complaint that Deputy Sheriffs Ronald K. Graffis and G. W. Simpson, defendants herein, have informed them that the statutes will be enforced against them. Defendants Graffis and Simpson, in their motion to dismiss Count II of the complaint, do not deny the allegation that they told plaintiffs that the statutes would be enforced against them, but argue only that they have not yet taken any action against plaintiffs.
 

 Accordingly, having found that abstention is not an appropriate avenue to pursue in this case under the principles set forth in either
 
 Railroad Commission of Texas v. Pullman, supra,
 
 or
 
 Younger v. Harris, supra,
 
 the Court will proceed to consider the merits of the motion to dismiss Count II of the complaint, filed on behalf of the defendants Graffis and Simpson, and the application of plaintiffs for preliminary injunctive relief.
 

 MOTION TO DISMISS SECTION 1983 CLAIM
 

 Count II of the plaintiffs’ complaint is a claim for damages under 42 U.S.C. § 1983 against the defendants Graffis and Simpson, deputy sheriffs for Lake County and Citrus County, respectively. The sole support for this claim is the allegation that Graffis and Simpson have indicated that they will enforce the challenged statutes against the plaintiffs. It is not alleged that either Graffis or Simpson have actually taken any action against plaintiffs pursuant to the statutes.
 

 In fact, Graffis and Simpson, in their motion to dismiss Count II, expressly state that they will not attempt to enforce the statutes against plaintiffs herein unless and until this Court enters an order declaring the statutes to be constitutional. Thus, as of yet defendants Graffis and Simpson have not taken
 
 any
 
 action under color of state law with respect to plaintiffs, much less any action that would operate to deprive plaintiffs of a right secured by the Constitution of the United States. Consequently, there is no immediate basis for the Section 1983 claim and it will be dismissed. The dismissal, however, will be without prejudice. Should Graffis or Simpson attempt to enforce the statutes against plaintiffs subsequent to entry of the Court’s preliminary injunction, see text
 
 infra,
 
 they could very well be liable under Section 1983 inasmuch as they would be on notice as to the constitutional defects inhering in the statutes.
 
 [4]
 

 INJUNCTIVE RELIEF
 

 Preliminary injunctive relief is an extraordinary remedy designed to protect a
 
 *1007
 
 plaintiff from sustaining irreparable injury and to preserve the power of the district court to render a meaningful decision following a trial on the merits.
 
 Canal Authority of State of Florida v. Callaway,
 
 489 F.2d 567, 572 (5th Cir. 1974). The decision whether or not injunctive relief is appropriate in a particular case lies within the discretion of the district court. 489 F.2d at 572;
 
 Johnson v. Radford,
 
 449 F.2d 115, 116 (5th Cir. 1971). In exercising that discretion, the district court must find that four prerequisites have been satisfied prior to granting preliminary injunctive relief:
 

 (1) a substantial likelihood that plaintiff will prevail on the merits;
 

 (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted;
 

 (3) that the threatened injury to plaintiff outweighs the harm the injunction may cause to defendant; and
 

 (4) that granting the preliminary injunction will not disserve the public interest.
 

 Canal Authority of State of Florida v. Call-away, supra,
 
 at 572. The Court will consider these four prerequisites
 
 seriatim:
 

 (1)
 
 Likelihood of success on the merits.
 

 It is very likely indeed that plaintiffs will succeed on the merits in their challenge to the constitutionality of Florida Statutes § 812.049 and § 812.051 (1981). Plaintiffs raise no less than seven constitutional issues with respect to Sections 812.-049 and 812.051. The Court finds it unnecessary to discuss each of these issues in great detail. Rather the Court will focus upon three of the major issues, resolution of which will be sufficient to support the finding that it is likely plaintiffs will prevail on the merits. The Court’s determination regarding the likelihood of success on the merits is, of course, preliminary in nature,based upon the limited evidence that has been presented thus far. The defendants will have the opportunity to persuade the Court otherwise should this cause proceed to a trial on the merits.
 
 [5]
 
 It is important to
 
 *1008
 
 note as a threshold matter that all of the factual allegations set forth in plaintiffs’ memorandum supporting their application for preliminary injunctive relief stand unrebutted at this point, in light of the failure of defendants to file any response opposing such factual allegations.
 

 Florida Statutes § 812.049 and § 812.051 were undoubtedly enacted as a crime-fighting mechanism designed to stem the recent tide of burglaries involving items containing precious metals. Precious metals, of course, have been prime fare for thieves since long before the conquistadors plundered the Aztecs and the Incas in the 16th Century. The recent spiraling of precious metal prices, however, and the concomitant flourishing of businesses engaging in secondhand precious metal transactions have apparently heightened the appealability of gold and silver as targets for thieves. The secondhand precious metal dealers offer thieves a means of easily disposing of stolen items containing precious metals. These dealers remain far from inconspicuous. In the true spirit of capitalism, they employ blaring newspaper advertisements that proclaim in no uncertain terms: “We Pay CASH for Gold and Silver!”
 

 The Florida Legislature, in enacting Florida Statutes § 812.049 and § 812.051, was understandably concerned with curtailing these readily accessible outlets for purloined precious metals. Undoubtedly, many of the secondhand precious metal dealers serve as little more than fences for stolen merchandise, either knowingly or unwittingly. Nevertheless, the statutes strike the Court as a classic example of a legislative over-reaction to a problem which, although real, is not of sufficient magnitude to justify the drastic and sweeping means employed to control it.
 

 Commerce Clause
 
 — It would appear that certain provisions of the challenged statutes, particularly the 15-day holding requirement, violate the Commerce Clause of the federal Constitution.
 
 U.S.Const.
 
 art. 1, § 8, cl. 3. Section 812.051(5) directs that persons dealing in secondhand goods retain any purchased item of precious metal within the county in an unaltered condition for a period of 15 days following submission of the records of purchase to the appropriate law enforcement authorities.
 

 A state undoubtedly has the authority, pursuant to its police power, to regulate matters of local concern in order to protect the health, well-being and safety of its citizens. Specifically as regards the Commerce Clause, the law is clear that, in the absence of federal legislation in the area, a state has the authority to regulate a matter of local concern where the regulation is local in character and effect, even though the regulation has some incidental impact upon the national economy.
 
 Cities Service Co. v. Peerless Oil & Gas Co.,
 
 340 U.S. 179, 186, 71 S.Ct. 215, 219, 95 L.Ed. 190 (1950);
 
 Southern Pacific Co. v. Arizona,
 
 325 U.S. 761, 767, 65 S.Ct. 1515, 1519, 89 L.Ed. 1915 (1945);
 
 Parker v. Brown,
 
 317 U.S. 341, 359-60, 63 S.Ct. 307, 317-18, 87 L.Ed. 315 (1943);
 
 Milk Control Board v. Eisenberg Farm Products,
 
 306 U.S. 346, 351, 59 S.Ct. 528, 530, 83 L.Ed. 752 (1939).
 

 The governing principle, as it has emerged from a long line of Supreme Court cases beginning with
 
 Cooley v. Board of Wardens of the Port of Philadelphia,
 
 53 U.S. (12 How.) 299, 13 L.Ed. 996 (1851), is that states are free to regulate those aspects of interstate commerce so local in character as to require diverse treatment, while only Congress can regulate those aspects of interstate commerce so national in character as to demand uniform treatment by a single authority. L.
 
 Tribe, American Constitutional Law
 
 § 6-4 (1978). The focus is upon the subject matter of the challenged state regulation. If the regulated activity is of predominantly local interest, the state action will be sustained. If the activity implicates interests of a national scope, the state action must fail.
 
 California v. Zook,
 
 336 U.S. 725, 728, 69 S.Ct. 841, 842, 93 L.Ed. 1005 (1949).
 

 
 *1009
 
 Thus, the Supreme Court recognized in
 
 Cooley
 
 the existence of concurrent jurisdiction between Congress and the states in some areas affecting interstate commerce. The
 
 Cooley
 
 doctrine has generally been limited, however, to situations in which Congress has failed to indicate, through the enactment of federal legislation, that the subject area is not one demanding uniform treatment on a national level.
 

 In other words, Congress has the power to redefine the dimensions of local and national interests as they relate to interstate commerce.
 
 California v. Zook, supra,
 
 336 U.S. at 728, 69 S.Ct. at 842;
 
 Prudential Insurance Co. v. Benjamin,
 
 328 U.S. 408, 66 S.Ct. 1142, 90 L.Ed. 1342 (1946). Congress can, through legislation, decide for itself that an area is a proper one for the exercise of exclusive federal jurisdiction.
 
 See Simpson v. Shepard,
 
 230 U.S. 352, 399, 33 S.Ct. 729, 739, 57 L.Ed. 1511 (1913). Where Congress has chosen to exercise its paramount power over commerce, state regulation that would otherwise be valid must fail.
 
 Dean Milk Co. v. City of Madison, Wisconsin,
 
 340 U.S. 349, 353, 71 S.Ct. 295, 297, 95 L.Ed. 329 (1951);
 
 Southern Pacific Co. v. Arizona, supra,
 
 325 U.S. at 769, 65 S.Ct. at 1520;
 
 Milk Control Board v. Eisenberg Farm Products, supra,
 
 306 U.S. at 351-52, 59 S.Ct. at 530-31.
 
 [6]
 
 This is true even though the challenged state action falls within the state’s police power.
 
 Dean Milk Co. v. City of Madison, Wisconsin, supra,
 
 340 U.S. at 353, 71 S.Ct. at 297;
 
 Milk Control Board
 
 v.
 
 Eisenberg Farm Products, supra,
 
 306 U.S. at 351-52, 59 S.Ct. at 530-31.
 
 [7]
 
 In deciding whether Congress has expressed an intention to “occupy” a particular field through the enactment of federal legislation, the proper inquiry in evaluating the relative status of the federal and state action is; Does the state action conflict with national policy?
 
 California v. Zook, supra,
 
 336 U.S. at 728, 69 S.Ct. at 842. As will be discussed in detail
 
 infra,
 
 the answer to this question in connection with the case
 
 sub judice
 
 would appear to be affirmative.
 

 Of course, if a state statute or regulation operates to directly burden, or disrupt the flow of, interstate commerce, it must fail even in the absence of competing federal legislation.
 
 See, e.g., Southern Pacific Co. v. Arizona, supra,
 
 325 U.S. at 767— 69, 65 S.Ct. at 1519-20 (and the cases cited therein);
 
 Simpson v. Shepard, supra,
 
 230 U.S. at 396, 33 S.Ct. at 738. The
 
 Cooley
 
 doctrine holds merely that, in the absence of federal legislation, a state enactment aimed at regulating matters of local concern is not invalid simply because it has an incidental impact upon the operation of the national economy. The doctrine does not, however, accord free rein to the states to regulate all matters of local interest, regardless of the effect of the regulation upon interstate commerce; for it has been accepted constitutional doctrine for a hundred years that “the commerce clause, without the aid of Congressional legislation, . . . affords some protection from state legislation inimical to the national commerce . . . . ”
 
 Southern Pacific Co. v. Arizona, supra,
 
 325 U.S. at 769, 65 S.Ct. at 1520.
 

 
 *1010
 
 The proper approach, in any case, is to balance the relative weights of the respective state and national interests involved.
 
 California v. Zook, supra,
 
 336 U.S. at 728, 69 S.Ct. at 842;
 
 Southern Pacific Co. v. Arizona, supra,
 
 325 U.S. at 770 — 71, 65 S.Ct. at 1521. If the state legislation operates to significantly obstruct the free flow of commerce among the several states it must fail.
 

 In the instant case, the challenged legislation would appear to be invalid under either strand of the Commerce Clause analysis discussed above, i.e., either on the ground that it interferes in an area requiring uniform national regulation or on the ground that it directly burdens or disrupts the flow of interstate commerce.
 

 The regulation of gold in this country is a power that has been exercised exclusively by either Congress or the President or both. Congressional power of regulation of gold has been held to be virtually absolute, extending to every facet of gold acquisition, ownership and transfer.
 
 See Norman v. Baltimore & Ohio Railroad Co.,
 
 294 U.S. 240, 55 S.Ct. 407, 79 L.Ed. 885 (1935);
 
 Laycock
 
 v.
 
 Kenney,
 
 270 F.2d 580 (9th Cir. 1959),
 
 cert. denied,
 
 361 U.S. 933, 80 S.Ct. 373, 4 L.Ed.2d 355 (1960). The power derives from several constitutional sources: the power to coin and regulate the value of money, the power to lay and collect taxes, the power to borrow, the power to fix the standards of weights and measures, the power to regulate commerce among the several states, and the power to make all laws which are necessary and proper for carrying into execution these enumerated powers.
 
 Norman v. Baltimore & Ohio Railroad Co., supra,
 
 294 U.S. at 303, 55 S.Ct. at 414;
 
 Laycock v. Kenney, supra,
 
 at 590.
 

 Following several piecemeal steps on the part of the President and Congress designed to restrict the use and transfer of gold among private citizens, Congress enacted the Gold Reserve Act of 1934, 31 U.S.C. § 440
 
 et seq.
 
 (hereinafter ‘the Act’). The Act wa? passed as part of the nation’s response to the Great Depression. Its purpose was to stabilize the value of the dollar, which had theretofore been steadily increasing in purchasing power, resulting in an overall depression of general price levels.
 
 Laycock v. Kenney, supra,
 
 at 585. The legislation operated to vest in the United States Treasury possession of all monetary gold stock within the United States.
 

 Section 3 of the Act, 31 U.S.C. § 442, delegated to the Secretary of the Treasury the authority to prescribe, by regulation, the conditions under which gold could be acquired, held, transported, exported or earmarked for private use. Acquisition and use of gold by private citizens was restricted to industrial, professional and artistic purposes. Purchasing, holding, selling or otherwise dealing in gold for investment or speculative purposes was specifically forbidden by the regulations promulgated under the Act. 31 C.F.R. §§ 54.14(b), 54.15 (1974);
 
 see Feldman
 
 v.
 
 Great Northern Railway Co.,
 
 428 F.Supp. 979, 983 (S.D.N.Y. 1977).
 

 Section 4 of the Act, 31 U.S.C. § 443, provided for the forfeiture of any gold acquired or used in violation of the Act. The legislative history of the Act indicated that Congress intended to place “complete control over this metal” in the hands of the United States government. “In order to protect the Government’s power over gold, the bill gives it the right to regulate the acquisition, transportation, etc., of the metal . . . . ” H.R.Rep.No.292, 73 Cong., 2d Sess.-(1934).
 

 In
 
 Laycock v. Kenney, supra,
 
 the Ninth Circuit Court of Appeals upheld the constitutionality of the Act in the face of a challenge that,
 
 inter alia,
 
 the legislation was beyond the power of Congress to enact. In so doing, the Court endorsed the broad powers of Congress over the nation’s monetary system, concluding that such power extended to “gold in any form,” and not merely to “monetary gold.” 270 F.2d at 591-92.
 

 In September 1973, Congress passed legislation repealing Sections 3 and 4 of the Gold Reserve Act. Act of September 21, 1973, Pub.L.93-110, 87 Stat. 352, Tit. I (hereinafter ‘Public Law 93-110’). Public Law
 
 *1011
 
 93-110, as amended by Act of August 14, 1974, Pub.L.93-373, 88 Stat. 445 (hereinafter ‘Public Law 93-373’), eliminated all prohibitions upon private ownership of gold, providing in pertinent part:
 

 (b) No provision of any law in effect on the date of enactment of this Act, and no rule, regulation or order in effect on the date subsections (a) and (b) become effective may be construed to prohibit any person from purchasing, holding, selling, or otherwise dealing with gold in the United States or abroad.
 

 Section 3(e) of Public Law 93-110 had provided that the lifting of prohibitions relating to private ownership of gold would become effective when the President reported to Congress that international monetary reform had proceeded to the point where elimination of the restrictions on private ownership would not adversely affect the international monetary position of the United States. Section 2(c) of Public Law 93-373 amended Section 3(c) of Public Law 93-110 to provide that the restrictions would automatically be lifted on December 31, 1974 if the President failed to act by then. The President did not act by December 31, 1974. Consequently, the elimination of the regulations pertaining to private ownership of gold became effective on that date.
 
 See Feldman v. Great Northern Railway Co., supra.
 

 It is apparent from the above discussion that the regulation of activities pertaining to the buying, selling and holding of gold by private citizens has always been a matter of national, rather than local, concern. The need for uniform regulation of matters relating to gold makes it one of those areas “of such a nature as to demand that, if regulated at all, .. . [its] regulation should be prescribed by a single authority.”
 
 Simpson v. Shepard, supra,
 
 230 U.S. at 399, 33 S.Ct. at 739. In fact, the Court would be hard pressed to single out any other commodity having a greater impact upon not simply the national economy, but upon the economy of the entire world. Surely, the regulation of private dealings in gold is not an- area demanding diverse treatment in accordance with the special requirements of local conditions.
 

 That gold regulation is a matter of national interest is evident from the fact that Congress has historically regulated the area and continues to do so. Indeed, plaintiffs make a strong argument that Section 3(b) of Public Law 93-110, as amended by Section 2(b) of Public Law 93-373, has totally preempted the area relating to private ownership and dealing in gold so as to preclude, under the Supremacy Clause of the Constitution,
 
 any
 
 attempt by the states to regulate gold.
 
 [8]
 
 Public Law 93-110 recites that
 
 “no
 
 provision of
 
 any
 
 law . . . may be construed to prohibit any person from purchasing, holding,
 
 or otherwise dealing
 
 with gold in the United States or abroad.” (Emphasis added).
 

 Although Florida Statutes § 812.049 and § 812.051 do not expressly prohibit dealing in gold,
 
 [9]
 
 they impose such. burdensome re
 
 *1012
 
 strictions upon the secondhand precious metal market as to make it impossible, or at least impractical, for dealers to carry on their business. These restrictions, particularly the 15-day holding requirement, interfere with the broad national authority over the subjects of revenue, finance, and currency to an impermissible extent.
 
 See Norman v. Baltimore & Ohio Railroad Co., supra,
 
 294 U.S. at 303, 55 S.Ct. at 414. Specifically, the Florida Statutes contravene the national policy reflected in Public Law 93-110 that private persons be free to buy, sell and otherwise deal in gold without restriction. As such, the challenged legislation is violative of the Commerce Clause of the United States Constitution.
 

 As discussed
 
 supra,
 
 there are two alternative bases for finding state legislation to be constitutionally defective under the Commerce Clause. In addition to being invalid because it interferes in areas requiring uniform national regulation, the Florida legislation would appear to be defective for the additional reason that it directly burdens or disrupts the flow of interstate commerce.
 
 See, e.g., Southern Pacific Co. v. Arizona, supra,
 
 325 U.S. at 767-69, 65 S.Ct. at 1519-20 (and the cases cited therein);
 
 Simpson v. Shepard, supra,
 
 230 U.S. at 399, 33 S.Ct. at 739.
 

 Plaintiffs allege that a substantial portion of the precious metals they deal in move in interstate commerce.
 
 [10]
 
 The 15-day holding requirement found in Section-812.-051(5) will, according to plaintiffs, disrupt their interstate precious metal businesses in at least three respects: (1) the requirement will operate to virtually eliminate Florida’s numerous coin shows and all other precious metal transactions between Florida sellers and out-of-state buyers because an out-of-state buyer would not be able to remove any item of precious metal from the county in which it was purchased for a period of 15 days following the transaction; (2) the requirement will disrupt the practice of plaintiffs, and dealers similarly situated, whereby they typically relinquish their precious metal inventory to out-of-state wholesalers pursuant to a pre-arranged agreement; (3) the requirement will interfere with the practice of plaintiffs, and dealers similarly situated, of utilizing the FACTS teletype service to buy and sell coins and other items of precious metals in interstate channels.
 

 The severity of these disruptions will be accentuated, according to plaintiffs, by the fact that the price of gold and other precious metals fluctuates widely and rapidly on a day to day basis. The Court can take judicial notice of the instability of the world gold market, where a single political or economic event can cause the price of an ounce of gold to either soar or plummet.
 
 Fed.R.Evid.
 
 201. Thus, a forced delay of even a few days in the transfer of precious metals could cause substantial losses to persons who deal in such goods. These allegations, if true, would appear to support a finding that the challenged legislation will operate to directly burden or disrupt the flow of interstate commerce.
 

 Accordingly, based upon the foregoing analysis, it appears likely that plaintiffs will succeed on the merits in their claim that Florida Statutes § 812.049 and § 812.051 are unconstitutional under the Commerce Clause of the United States Constitution.
 

 Fourth Amendment
 
 — Sections 812.051(1), (l)(a) and (l)(d) require that every junk dealer, scrap-metal processor, secondhand
 
 *1013
 
 precious metal dealer and foundry keep a record of every purchase of
 
 metal,
 
 as defined in Section 812.049(3), which record shall contain the date of purchase and the name, address, signature and driver’s license number or some other identifying number of the person selling the item of metal. Sections 812.051(1) and (l)(b) require every junk dealer, scrap-metal, processor, secondhand precious metal dealer and foundry to keep a record of every purchase of
 
 precious metal,
 
 as defined in Section 812.049(4), which record shall contain the full name, residence address, home phone number, business phone number, place of employment, age, race, sex, signature, driver’s license number, an additional identifying number, and a photograph or thumb print of the person selling the item of precious metal. The record must also reflect the date of purchase and the quantity of the precious metal purchased. Sections 812.051(l)(d), (l)(e). Additionally, all purchase records must contain a general description of the type of any utility copper wire purchased and a specific description of any item of precious metal purchased. Section 812.051(l)(c).
 

 Section 812.051(2) provides that “[t]he records shall at all times be subject to inspection by all law enforcement officers and shall be preserved for a period of 3 years after purchase.” Section 812.051(3) provides that the records “shall be submitted to the sheriff of the county and the municipal police of the municipality in which the business is operated within 24 hours after purchase.”
 
 [11]
 
 Section 812.051(5), which contains the 15 day holding requirement, provides that all items of precious metals “shall be made available for inspection by any law enforcement officer upon request.” Plaintiffs contend that Sections 812.051(2), (3) and (5) violate their rights under the Fourth Amendment to be free from unreasonable searches and seizures. The Court agrees.
 

 The Fourth Amendment issues raised by Sections 812.051(2), (3) and (5) present a hybrid of two distinct lines of case law that have emanated from the Supreme Court. On the one hand, there are the “administrative search” cases, the bottom line of which is that a search warrant must be obtained prior to conducting a regulatory inspection of either a dwelling or a business establishment. On the other hand, there are the “subpoena” cases, the bottom line of which is that, although they do not require a search warrant or a strict showing of probáble cause, subpoenas do implicate Fourth Amendment interests and are subject to a test of reasonableness. As will be developed more fully below, the statutory provisions enumerated above combine aspects of both of these law enforcement mechanisms without incorporating the protections afforded by either.
 

 It is appropriate to commence the analysis with a recognition of the basic purpose underlying the Fourth Amendment. The Amendment was designed “to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials,” thereby giving “concrete expression to a right of the people which ‘is basic to a free society.’ ”
 
 Camara
 
 v.
 
 Municipal Court,
 
 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967),
 
 quoting Wolf v. Colorado,
 
 338 U.S. 25, 27, 69 S.Ct. 1359, 1361, 93 L.Ed. 1782 (1949). Of course, it has long been established that corporations, as well as individuals, enjoy the protections of the Fourth Amendment.
 
 Silverthorne Lumber Co., Inc. v. United States,
 
 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920);
 
 Hale v. Henkel,
 
 201 U.S. 43, 76, 26 S.Ct. 370, 379, 50 L.Ed. 652 (1906);
 
 Peel
 
 v.
 
 United States,
 
 316 F.2d 907, 910 (5th Cir. 1963). The guiding principle in effectuating the protections afforded by the Fourth Amendment is that, except under certain narrowly defined circumstances, a search of private property without proper consent is unreasonable unless it has been authorized by a
 
 *1014
 
 valid search warrant.
 
 See, e. g., Camara v. Municipal Court, supra,
 
 387 U.S. at 528-29, 87 S.Ct. at 1730-31;
 
 Stoner v. California,
 
 376 U.S. 483, 486, 84 S.Ct. 889, 891, 11 L.Ed.2d 856 (1964);
 
 Jones v. United States,
 
 357 U.S. 493, 499, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514 (1958);
 
 United States v. Jeffers,
 
 342 U.S. 48, 51, 72 S.Ct. 93, 95, 96 L.Ed. 59 (1951).
 

 Of all types of searches, perhaps the least intrusive is the so-called “administrative search.” These searches are generally conducted by persons charged with enforcing the code or regulations of a particular administrative agency. The purpose of the administrative search is to monitor and enforce compliance with regulatory schemes designed to promote the health and safety of various groups of persons. • Thus, the immediate object of such searches is unrelated to the furtherance of criminal investigations. Initially, this characterization of administrative searches as non-criminal in nature was employed to justify the rule that it was not necessary to obtain a search warrant in advance of such a search.
 
 Frank v. Maryland,
 
 359 U.S. 360, 79 S.Ct. 804, 3 L.Ed.2d 877 (1959).
 

 In
 
 Camara v. Municipal Court, supra,
 
 the Supreme Court overruled the
 
 Frank
 
 decision to the extent it authorized regulatory searches of private dwellings without a search warrant. 387 U.S. at 534, 87 S.Ct. at 1733. The appellant in
 
 Camara
 
 had been charged with a criminal violation of the San Francisco Housing Code for refusing to permit a warrantless inspection of his residence. Section 503 of the Code authorized such inspections, providing:
 

 Sec. 503 Right to Enter Building.
 

 Authorized employees of the City departments or City agencies, so far as may be necessary for the performance of their duties, shall, upon presentation of proper credentials, have the right to enter, at reasonable times, any building, structure, or premises in the City to perform any duty imposed upon them by the Municipal Code.
 

 387 U.S. at 526, 87 S.Ct. at 1729.
 

 The Court, in holding that regulatory inspections of private dwellings are prohibited in the absence of a validly obtained search warrant, rejected the conclusion in
 
 Frank
 
 that administrative searches touch only peripherally upon Fourth Amendment interests because they are not part of a criminal investigation. While acknowledging that administrative searches constitute a “less hostile intrusion” then the typical search for evidence in a criminal case, the Court declined to accept the premise in
 
 Frank
 
 that such searches entail only de minimis adverse consequences for the subject of the search.
 

 [Ejven accepting Frank’s rather remarkable premise, inspections of the kind we are here considering do in fact jeopardize ‘self-protection’ interests of the. property owner. Like most regulatory laws, fire, health, and housing codes are enforced by criminal processes. In some cities, discovery of a violation by the inspector leads to a criminal complaint. Even in cities where discovery of a violation produces an administrative compliance order, refusal to comply is a criminal offense, and the fact of compliance is verified by a second inspection, again without a warrant. Finally, as this case demonstrates, refusal to permit inspection is itself a crime, punishable by fine or even jail sentence.
 

 387 U.S. at 531, 87 S.Ct. at 1732.
 

 The crux of the Court’s concern in
 
 Camara
 
 was that, in the absence of a warrant requirement, persons subject to the inspecting agency’s jurisdiction would be left to the mercy of the field agent. The agent would be free to exercise unrestricted discretion in determining where, when and how he would conduct a search. The Court observed that, in the absence of a warrant requirement:
 

 [w]hen the inspector demands entry, the occupant has no way of knowing whether enforcement of the municipal code involved requires inspection of his premises, no way of knowing the lawful limits of the inspector’s power to search, and no way of knowing whether the inspector himself is acting under proper authoriza
 
 *1015
 
 tion. These are questions which may be reviewed by a neutral magistrate without any reassessment of the basic agency decision to canvass an area. Yet, only by refusing entry and risking a criminal conviction can the occupant at present challenge the inspector’s decision to search. And even if the occupant possesses sufficient fortitude to take the risk, as appellant did here, he may never learn any more about the reason for the inspection than that the law generally allows housing inspectors to gain entry. The practical effect of this system is to leave the occupant subject to the discretion of the official in the field. This is precisely the discretion to invade private property which we have consistently circumscribed by a requirement that a disinterested party warrant the need to search.
 

 387 U.S. at 532-33, 87 S.Ct. at 1732-33.
 

 The ultimate test in any search and seizure case is one of “reasonableness.” Probable cause, said the Court, is the standard by which a decision to search is measured against the constitutional mandate of reasonableness. 387 U.S. at 534, 87 S.Ct. at 1733. However, while the Court rejected the criminal non-criminal distinction as it related to the necessity of obtaining a warrant prior to conducting an administrative search, it retained and relied upon such a distinction in setting a less stringent standard of probable cause in the context of administrative searches.
 

 In seeking a warrant to conduct an administrative search, it is not necessary to demonstrate specific knowledge of a violation within the particular dwelling to be searched. Rather, probable cause in this setting contemplates a showing that specific standards have been established to govern the process of selecting which premises will be searched and that those standards have been followed. 387 U.S. at 538, 87 S.Ct. at 1735. In the context of municipal housing code inspections, such standards may be based upon the passage of time, the nature of the building, or the condition of the area. 387 U.S. at 538, 87 S.Ct. at 1735. Only through this process — establishment of concrete standards and individualized review by a neutral magistrate to ensure that those standards have been followed — can we be sure that individuals will be protected from arbitrary intrusions onto their property by governmental officials.
 

 In
 
 See v. City of Seattle,
 
 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed. 943 (1967), the companion case to
 
 Camara,
 
 the Supreme Court emphasized that the search warrant requirement applies not only to private dwellings, but to business establishments as well. The appellant in
 
 See
 
 had been convicted in state court for refusing to allow a city official to inspect his commercial warehouse for violations of the city’s fire code. The code authorized routine, periodic inspections of all buildings, except private dwellings, providing:
 

 Inspection of Buildings and Premises.
 

 It shall be the duty of the Fire Chief to inspect and he may enter all buildings and premises, except the interiors of dwellings, as often as may be necessary for the purpose of ascertaining and causing to be corrected any conditions liable to cause fire, or any violations of the provisions of this Title, and any other ordinance concerning fire hazards.
 

 387 U.S. at 541, 87 S.Ct. at 1738.
 

 The only question before the Court was whether the holding of
 
 Camara
 
 applied with equal force to inspections of commercial structures. The Court answered the question affirmatively, concluding that a search warrant was a necessary prerequisite to an administrative search of business premises.
 

 As we explained in Camara, a search of private houses is presumptively unreasonable if conducted without a warrant. The businessman, like the occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries onto his private commercial property. The businessman, too, has that right placed in jeopardy if the decision to enter and inspect for violation of regulatory laws can be made and enforced by the inspector in the field with
 
 *1016
 
 out official authority evidenced by a warrant.
 

 387 U.S. at 543, 87 S.Ct. at 1739.
 

 The Court has subsequently carved out an exception to the warrant requirement relating to administrative searches of so-called “pervasively regulated businesses.” In
 
 Colonnade Catering Corp. v. United States,
 
 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970), the Court upheld the statutory authority granted to agents of the Alcohol and Tobacco Tax Division of the Internal Revenue Service to inspect facilities of licensed liquor dealers without a warrant, but held that the $500 fine provided for in the legislation constituted the sole penalty the government could impose for refusing to permit an agent to conduct an inspection. In other words, the Court held that the government agents were not permitted to forcibly enter appellant’s premises in the absence of a search warrant. 397 U.S. at 77, 90 S.Ct. at 777.
 
 [12]
 

 In creating this limited exception to the warrant requirement, the Court relied upon the long history of pervasive governmental regulation of the liquor industry. The Court pointed out that a precursor of modern-day liquor legislation was enacted in England in 1660 and that in 1791, the year in which the Fourth Amendment was ratified, Congress passed legislation granting broad powers to federal officers to inspect the premises of liquor importers. The history of pervasive regulation of the liquor industry was found to be sufficient to support the power' of Congress to authorize warrantless inspections of premises where liquor is stored.
 

 The reasoning of
 
 Colonnade
 
 was carried over and applied to another pervasively regulated industry in
 
 United States v. Biswell,
 
 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972). In
 
 Biswell,
 
 the Court upheld the validity of a warrantless search conducted pursuant to the Gun Control Act of 1968, 18 U.S.C. § 921
 
 et seq.
 
 Title 18 U.S.C. § 923(g) authorizes official entry during business hours of “the premises (including places of storage) of any firearms or ammunition ... dealer ... for the purpose of inspecting or examining (1) any records or documents required to be kept . .. and (2) any firearms or ammunition kept or stored by such . . . dealer . . . . ” 406 U.S. at 311, 92 S.Ct. at 1594. Respondent, a pawn shop operator and a federally-licensed firearm dealer, was convicted of federal firearms violations after an inspection of his business premises turned up two sawed-off shotguns.
 

 In upholding the warrantless search, the Court focused upon the nature of respondent’s business and the fact that he was federally licensed to engage in such business. While acknowledging that regulation of the firearm industry is not as deeply rooted in history as is the regulation of the liquor industry, the Court noted the “central importance” of “close scrutiny” of firearm traffic in the federal campaign against violent crime. 406 U.S. at 315, 92 S.Ct. at 1596. Moreover, by seeking and obtaining a federal license to engage in firearm transactions, a dealer impliedly consents to be governed by the restrictions appertaining to such a business. Since each licensee is furnished annually with a revised compilation of regulations defining his obligations as a licensed dealer, he has only a limited expectation of privacy in matters relating to his firearm business. Thus, concluded the Court, warrantless inspections of a firearm dealer’s premises do not violate the Fourth Amendment. 406 U.S. at 316, 92 S.Ct. at 1596.
 

 In
 
 Marshall v. Barlow’s, Inc.,
 
 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed. 305 (1978), the Supreme Court made it clear that its decisions in
 
 Colonnade
 
 and
 
 Biswell
 
 constitute the exception, rather than the rule, regard
 
 *1017
 
 ing the search warrant requirement. Respondent was president and general manager of Barlow’s Inc., a business engaged in installing electrical and plumbing systems. Pursuant to Section 8(a), 29 U.S.C. § 657(a), of the Occupational Safety and Health Act of 1970 (hereinafter ‘OSHA’), an agent of the Secretary of Labor (hereinafter ‘Secretary’) sought to enter respondent’s premises to conduct a safety inspection. Respondent refused to admit the OSHA inspector, stating that he was relying upon his rights guaranteed under the Fourth Amendment.
 

 The Secretary sought and obtained an order in federal court compelling respondent to admit the inspector. Respondent again refused to permit the inspection and petitioned the federal court for his own injunctive relief. The case was heard by a three-judge court which entered an order declaring the statutory authorization for warrantless searches to be unconstitutional. 436 U.S. at 310, 98 S.Ct. at 1819. On appeal, the Supreme Court affirmed, rejecting the Secretary’s argument that the case was controlled by the decisions in
 
 Colonnade
 
 and
 
 Biswell.
 

 Certain industries have such a history of government oversight that no reasonable expectation of privacy [citing case] could exist for a proprietor over the stock of such an enterprise. Liquor (Colonnade) and firearms (Biswell) are industries of this type; when an entrepreneur embarks upon such a business, he has voluntarily chosen to subject himself to a full arsenal of governmental regulations.
 

 Industries such as these fall within the ‘certain carefully defined classes of cases’ referenced in
 
 Camara,
 
 supra, 387 U.S., at 528, 87 S.Ct. at 1731, 18 L.Ed.2d 930 [1727]. The element that distinguishes these enterprises from ordinary businesses is a long tradition of close government supervision, of which any person who choses to enter such a business must already be aware. ‘A central difference between those cases
 
 [Colonnade
 
 and
 
 Bis-well]
 
 and this one is that businessmen engaged in such federally licensed and regulated enterprises accept the burdens as well as the benefits of their trade, where the petitioner here was not engaged in any regulated or licensed business. The businessman in a regulated industry in effect consents to the restrictions placed upon him.’
 
 Almeida-Sanchez v. United States,
 
 413 U.S. 266, 271, 93 S.Ct. 2535, 2538, 37 L.Ed.2d 596 (1973).
 
 The clear import of our cases is that the closely regulated industry of the type involved in Colonnade and Biswell is the exception. The Secretary would make it the rule.
 

 436 U.S. at 313, 98 S.Ct. at 1820 (Emphasis added).
 

 The Secretary had argued that, pursuant to the Walsh-Healey Act of 1936, 41 U.S.C. § 35
 
 et seq.,
 
 all employers involved in interstate commerce have long been subject to close scrutiny and supervision regarding their health and safety practices. The Court dismissed this broad-brush attempt to sweep all businesses engaged in interstate commerce within the narrow exception to the warrant requirement created in the “pervasively regulated businesses” cases. Once again, the Court emphasized that a search warrant requirement was necessary to protect citizens from the “almost unbridled discretion” of executive and administrative officers, particularly those agents in the field, in determining when and where to search. 436 U.S. at 323, 98 S.Ct. at 1825.
 

 Prior to reaching the merits of the Fourth Amendment challenge to the relevant provisions of Section 812.051, it is necessary to explore another line of cases that touches upon the Fourth Amendment issues raised herein. The relevance of these cases, involving the relationship of the Fourth Amendment to subpoenas for the production of tangible objects, arises from the fact that the “search and seizure” provisions of Section 812.051 do not present a true “administrative search” situation. Rather, they combine features of an administrative search with features of a forced production of tangible objects akin to a subpoena duces tecum.
 

 It was established long ago that subpoenas, while not subject to a literal test
 
 *1018
 
 of probable cause, are nevertheless controlled by the Fourth Amendment.
 
 Hale v. Henkel, supra,
 
 201 U.S. at 76, 26 S.Ct. at 376;
 
 Interstate Commerce Commission v. Brimson,
 
 154 U.S. 447, 14 S.Ct. 1125, 38 L.Ed. 1047 (1894);
 
 Boyd v. United States,
 
 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886). The test, as in all Fourth Amendment cases, is one of “reasonableness,” and, although the precise standard varies as between corporations and individuals, it is clear that the Fourth Amendment protections from unreasonable subpoenas extend to corporations as well as to individuals.
 
 See v. City of Seattle, supra,
 
 387 U.S. at 544, 87 S.Ct. at 1739;
 
 Siverthorne Lumber Co. Inc. v. United States, supra,
 
 251 U.S. at 392, 40 S.Ct. at 182;
 
 Hale v. Henkel, supra,
 
 201 U.S. at 76, 26 S.Ct. at 379;
 
 Peel v. United States, supra,
 
 316 F.2d at 910. A subpoena ordering the production of corporate books and records or other tangible objects that is not sufficiently limited in scope, relevant in purpose, and specific in directive constitutes an unreasonable search and seizure under the Fourth Amendment.
 
 See v. City of Seattle, supra,
 
 387 U.S. at 544, 87 S.Ct. at 1739;
 
 see United States v. Morton Salt Co.,
 
 338 U.S. 632, 652, 70 S.Ct. 357, 368, 94 L.Ed. 401 (1950);
 
 Oklahoma Press Publishing Co. v. Walling,
 
 327 U.S. 186, 209, 66 S.Ct. 494, 505, 90 L.Ed. 614 (1946);
 
 Hale v. Henkel, supra,
 
 201 U.S. at 76, 26 S.Ct. at 379.
 

 Two features of a subpoena for the production of books and records or other tangible objects operate to protect against arbitrary governmental intrusions into otherwise private corporate or individual domains. First, while the standard of probable cause required to support a subpoena is extremely minimal as compared with that required to support a search warrant in a criminal investigation, some protection is afforded by the directive that subpoenas be sufficiently limited in scope, relevant in purpose, and specific in directive. The primary protection afforded by the subpoena process, however, is the fact that it cannot be enforced by the agent in the field, but only upon order of court following judicial review.
 
 See v. City of Seattle, supra,
 
 387 U.S. at 544, 87 S.Ct. at 1739;
 
 see generally
 
 1
 
 W. Ringel Searches & Seizures, Arrests and Confessions
 
 § 14.2 (1980).
 

 The right to a hearing on a motion to quash prior to complying with a subpoena affords an individual or a corporation the same basic protection afforded by the warrant requirement, i.e., review of the agency action by a neutral, independent judicial officer. In the typical on-site search situation, subsequent judicial review would be futile, coming at a time when the damage has already been done. On the other hand, because there is no immediate intrusion in the typical subpoena case, subsequent judicial review provides an adequate safeguard against unlawful intrusions. This essential distinction between on-premises searches and subpoenas for the production of tangible objects justifies the fundamental “trade-off” in the respective showings that must be made prior to obtaining a search warrant and a subpoena.
 

 Turning to the specifics of the instant case, it is apparent, as already noted, that the challenged provisions of Section 812.051 do not precisely fit the mold of either the administrative search cases or the subpoena cases, but rather combine features of both. On the one hand, Sections 812.051(2) and (5) resemble a subpoena duces tecum in that they are, by their terms, limited to a forced production of records and items containing precious metals. They do not expressly authorize a true warrantless search of the premises of a precious metal dealer. On the other hand, the records and items containing precious metals must, under the statutes, be produced immediately, at the dealer’s business premises, upon request by any law enforcement officer. There is no opportunity to seek judicial review of the officer’s request. These facts — statutorily mandated production of records and other tangible items upon request, backed up by the threat of immediate
 
 [13]
 
 arrest for re
 
 *1019
 
 fusing to comply with the request — operate to edge the statutory procedure out of the realm of the subpoena cases and closer to administrative search cases.
 

 Moreover, although the statutes do not authorize an actual search of the premises, it is conceivable that the requirement of Section 812.051(5) that all items containing precious metals “shall be made available for inspection by any law enforcement officer upon request” could, as a practical matter, result in routine warrantless inspections of the dealer’s premises. If, for example, a law enforcement officer demanded to inspect every item of precious metal in a dealer’s inventory, and the Court is unable to find anything in the statute to prevent such a demand,
 
 [14]
 
 it would be impractical, if not impossible, for the dealer to produce every such item at the front counter of his business establishment. In many cases, the dealer would be faced with the unenviable choice of either allowing the officer to inspect his premises or risk being arrested on the spot and charged with a first degree misdemeanor.
 

 Nevertheless, regardless of whether Sections 812.051(2) and (5) are judged in light of the legal standard derived from the administrative search cases or that of the subpoena cases, the Court is of the opinion that they fail to pass constitutional muster under the Fourth Amendment. As noted, the relevant sections of the Florida legislation authorize “any law enforcement officer” to command a secondhand precious metal dealer to produce any or all of the records required to be kept by the statutes, as well as any or all items within the dealer’s possession that contain precious metal, at any time, without restriction.
 

 If one deems the statutory procedure to be akin to an administrative search it is patently invalid because it fails to incorporate a search warrant requirement.
 
 [15]
 

 See v. City of Seattle, supra; Marshall v. Barlow’s, Inc., supra.
 
 Sections 812.051(2) and (5) do not even attempt to establish any standards governing the search selection process. Which dealers may be searched? When may the searches be conducted? How often is a particular dealer subject to search? Once a month? Once a week? Every day? It is impossible to say, for the statutes are silent on each of these points.
 

 Sections 812.051(2) and (5) are thus far more offensive than the statutory provisions declared unconstitutional in
 
 Marshall.
 
 Section 8(a) of OSHA provided for inspections at “reasonable times,” “during regular working hours,” “within reasonable limits,” and “in a reasonable manner.” 436 U.S. at 309-10, 98 S.Ct. at 1818-19. To the contrary, Section 812.051(2) provides that the
 
 *1020
 
 records “shall at all times be subject to inspection,” while Section 812.051(5) specifies that items containing precious metal “shall be made available for inspection .. . upon request.” The Florida legislation thus devolves to agents in the field the “unbridled discretion” condemned in
 
 Marshall,
 
 436 U.S. at 323-24, 98 S.Ct. at 1825-26, and the other administrative search cases.
 
 [16]
 

 Moreover, this is not a case that fits within the narrow “pervasively regulated businesses” exception created in
 
 Colonnade Catering Corporation v. United States, supra,
 
 and applied in
 
 United States v. Biswell, supra.
 
 As the Supreme Court made clear in
 
 Marshall,
 
 the closely regulated industry of the type involved in
 
 Colonnade
 
 and
 
 Biswell
 
 is the exception, rather than the rule. 436 U.S. at 313, 98 S.Ct. at 1820. The secondhand precious metal businesses of the type sought to be regulated by the state statutes challenged herein do not have a long history of pervasive regulation such as would justify warrantless inspections of their premises. To the contrary, when Congress repealed federal prohibitions on the private ownership of gold in 1973, see text
 
 supra,
 
 it expressed an intent that persons should be free to buy, sell, or otherwise deal in gold, without restriction.
 

 The pervasively regulated businesses exception has thus far been limited to the liquor and firearms industries. Those products have long histories of close governmental regulation primarily because they are themselves inherently dangerous. The only justification for the instant attempt to regulate precious metals, however, is the interest in combatting precious metal thefts. Although this is unquestionably a valid interest, the Supreme Court has made it clear that fundamental Fourth Amendment rights are not to be dispensed with “simply because of a generalized urgency of law enforcement.”
 
 Torres v. Commonwealth of Puerto Rico,
 
 442 U.S. 465, 473, 99 S.Ct. 2425, 2431, 61 L.Ed.2d 1 (1979) (declaring unconstitutional a Puerto Rico statute that authorized inspection of luggage of persons arriving from the United States). Consequently, the pervasively regulated businesses exception does not operate to remove Sections 812.051(2) and (5) from the general rule that administrative searches are invalid absent a search warrant.
 

 Turning to the subpoena cases, it is doubtful that the requests to produce authorized by Sections 812.051(2) and (5) satisfy even the minimal standard that a subpoena be sufficiently limited in scope, relevant in purpose, and specific in directive so as not to constitute an unreasonable search and seizure under the Fourth Amendment.
 
 See v. City of Seattle, supra,
 
 387 U.S. at 544, 87 S.Ct. at 1739;
 
 United States v. Morton Salt Co., supra,
 
 338 U.S. at 652, 70 S.Ct. at 368;
 
 Oklahoma Press Publishing Co., supra,
 
 327 U.S. at 209, 66 S.Ct. at 505;
 
 Hale v. Henkel, supra,
 
 201 U.S. at 76, 26 S.Ct. at 379. Of even greater significance, however, is the fact that the statutory procedure fails to incorporate any means by which an individual or corporation subject to its provisions can be assured that the actions of the law enforcement officer have the approval of a neutral judicial official. The availability of judicial review prior to any actual forced production of books and records or other tangible objects pursuant to a subpoena, as noted
 
 supra,
 
 provides a safeguard against arbitrary governmental intrusions similar to that contemplated by the Fourth Amendment’s warrant requirement.
 
 See See v. City of Seattle, supra,
 
 387 U.S. at 544-45, 87 S.Ct. at 1739-40;
 
 Oklahoma Press Publishing Co. v. Walling, supra,
 
 327 U.S. at 195, 66 S.Ct. at 498.
 

 Section 812.051(3) suffers from infirmities similar to those already discussed in connection with Sections 812.051(2) and (5). It requires that all records of purchase required to be kept pursuant to the statutes
 
 *1021
 
 be submitted to the county sheriff and the municipal police department within 24 hours of the transaction. In practical effect, it amounts to a continuing subpoena duces tecum, applicable to every record of every purchase of every item containing precious metal from the time the statutes became effective until the end of civilization or, at least, until the statutes are declared unconstitutional.
 

 The requirement cannot be said to be even rationally related to any valid interest in law enforcement, unless one is convinced that
 
 every
 
 item of precious metal purchased at the secondhand level has been stolen. As such, the provision cannot be said to be sufficiently limited in scope, relevant in purpose and specific in directive.
 
 See v. City of Seattle, supra,
 
 387 U.S. at 544, 87 S.Ct. at 1739. Rather, it is so sweeping as to constitute an unreasonable search under the Fourth Amendment.
 
 United States v. Dionisio,
 
 410 U.S. 1, 11, 93 S.Ct. 764, 770, 35 L.Ed.2d 67 (1973);
 
 Hale v. Henkel, supra,
 
 201 U.S. at 76, 26 S.Ct. at 379.
 

 Moreover, the provision fails to provide any means through which a dealer can obtain judicial review prior to being compelled to produce the records. For this reason, as well as the fact that it places a continuing, sweeping, unduly burdensome obligation upon secondhand precious metal dealers, Section 812.051(3) is offensive to the Fourth Amendment.
 

 Accordingly, in light of the foregoing discussion, the Court is of the opinion that Sections 812.051(2), (3) and (5) subject secondhand precious metal dealers to what amount to unreasonable searches and seizures under the Fourth Amendment to the United States Constitution. It is likely, therefore, that plaintiffs will succeed on the merits in their Fourth Amendment challenge to the Florida legislation.
 

 Vagueness
 
 — Plaintiffs contend that several provisions of the challenged legislation are unconstitutionally vague. A state criminal statute is void for vagueness under the Due Process Clause of the Fourteenth Amendment if it either fails to give fair notice to persons of common intelligence as to what conduct it requires or proscribes,
 
 Lanzetta v. United States,
 
 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939), or encourages arbitrary and erratic enforcement.
 
 Thornhill v. Alabama,
 
 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940). Related to the “fair notice” requirement is the rule that inexplicably contradictory commands in statutes providing for criminal penalties will not be given legal effect.
 
 Raley v. Ohio,
 
 360 U.S. 423, 438, 79 S.Ct. 1257, 1266, 3 L.Ed.2d 1344 (1959);
 
 United States
 
 v.
 
 Cardiff,
 
 344 U.S. 174, 176, 73 S.Ct. 189, 190, 97 L.Ed. 200 (1952).
 

 The instant statutes are clearly criminal statutes, providing that one who violates their terms is guilty of a first degree misdemeanor. Section 812.051(8).
 
 [17]
 
 The statutes are, however, arguably the type of regulatory legislation that the Supreme Court has stated should be accorded greater leeway when challenged on vagueness grounds. When dealing with regulatory Statutes governing business activities, where the acts limited are in a narrow category, a less stringent vagueness standard applies than in eases involving statutes aimed at regulating purely individual behavior.
 
 Papachristou v. City of Jacksonville,
 
 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972);
 
 see, e.g., Boyce Motor Lines, Inc. v. United States,
 
 342 U.S. 337, 72 S.Ct. 329, 96 L.Ed. 367 (1952);
 
 United States v. National Dairy Products Corp.,
 
 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963);
 
 United States v. Petrillo,
 
 332 U.S. 1, 67 S.Ct. 1538, 91 L.Ed. 1877 (1947).
 

 As the Supreme Court stated in
 
 Boyce Motor Lines, Inc. v. United States, supra,
 
 “few words possess the precision of mathematical symbols .. . and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions.” 342 U.S. at 340, 72 S.Ct. at 330.
 
 *1022
 
 Consequently, said the Court, only a “reasonable degree of certainty” is required. 342 U.S. at 340, 72 S.Ct. at 330.
 

 In
 
 Boyce,
 
 the Court upheld the constitutionality of an Interstate Commerce Commission (‘ICC’) regulation that directed drivers transporting explosive or inflammable materials to avoid “so far as practicable, and, where feasible, by prearrangement of route, driving onto or through congested thoroughfares, . .. tunnels, ... and dangerous crossings.” 49 C.F.R. § 197.1(b). A federal statute, 18 U.S.C. § 835, delegated authority to the ICC to formulate regulations governing the safe transportation of dangerous materials and provided a penalty of up to one year imprisonment, or a $1,000 fine, or both, for whoever knowingly violated any regulation promulgated under the statute.
 

 Petitioner was charged in three counts for, on three separate occasions, knowingly driving a truck loaded with an explosive material through New York’s Holland Tunnel, a congested thoroughfare. On the third trip the truck exploded, injuring approximately 60 persons. The district court dismissed the three counts, finding that the terms “so far as practicable” and “where feasible” were void for vagueness. The Third Circuit Court of Appeals reversed, concluding that the regulation, when interpreted in conjunction with the statute, established a reasonably definite standard of conduct. 342 U.S. at 339-40, 72 S.Ct. at 330-31.
 

 The Supreme Court affirmed the court of appeals. In so doing, the Court concluded that “reasonable certainty” does not preclude the use of ordinary terms to express ideas having their foundation in common experience. 342 U.S. at 340-41, 72 S.Ct. at 330-31. The Court stressed the fact, however, that the statute applied only to those who knowingly violated its terms. If one is found to have knowingly violated a statute, it follows a
 
 fortiori
 
 that the person necessarily understood what conduct the statute proscribed. “This requirement of the presence of culpable intent as a necessary element of the offense does much to destroy any force in the argument that application of the Regulation would be so unfair that it must be held invalid.” 342 U.S. at 342, 72 S.Ct. at 331.
 

 The challenged Florida legislation, contrary to the legislation considered in
 
 Boyce,
 
 does not require any showing of scienter prior to finding a person guilty under the statutes. Conspicuously absent from the penalty subsection of the statute is the word
 
 knowingly,
 
 or its equivalent. Section 812.051(8) simply provides that “[a]ny person who violates the provisions of this section is guilty of a misdemeanor of the first degree .... ” Thus, even assuming the Florida legislation is the type of business regulatory legislation subject to a less stringent vagueness test than legislation aimed solely at regulating individual behavior, the absence of a culpable intent requirement would, under
 
 Boyce,
 
 appear to subject it to a higher level of judicial scrutiny.
 

 Plaintiffs primary argument in connection with their vagueness attack is that it is impossible to discern either the persons or the objects to which the statutes apply. This foundational defect, plaintiffs claim, arises from the definitions of “precious metals” and “person dealing in secondhand goods,” as contained in Sections 812.049(4) and (5), respectively. “Precious metals” is defined to mean “any item previously sold at retail, containing any gold, silver, or platinum.” Section 812.049(4). “Person dealing in secondhand goods” is defined to mean “every person who engages in the business of buying or selling precious metals.” Section 812.049(5).
 

 Plaintiffs, directing the Court’s attention to the
 
 Mineral Commodity Summaries
 
 (January 1981) published by the United States Department of Interior, Bureau of Mines, contend that the wide and varied use of gold, silver and platinum among numerous diverse industries in the economy make the scope and application of the statutes totally ambiguous. The
 
 Mineral Commodity Summaries
 
 reveal that gold, platinum and silver use is dispersed throughout various industries in the following percentages:
 

 
 *1023
 
 Gold
 

 Jewelry and Arts 43%
 

 Electronics 36%
 

 Dental 14%
 

 Small Bars 7%
 

 100%
 

 Id.
 
 at 60.
 

 Platinum
 

 (Platinum, Palladium, Iridium, Osmium, Rhodium, Ruthenium)
 

 Automotive (catalysts) 35%
 

 Electronics 24%
 

 Chemical 14%
 

 Dental 10%
 

 Other 17%
 

 100%
 

 Id.
 
 at 114.
 

 Silver
 

 Photography 40%
 

 Electronics 27%
 

 Sterlingware 11%
 

 Bronzing alloys and Solders 7%
 

 Other 15%
 

 100%
 

 Id.
 
 at 142.
 

 The argument is that persons dealing in used ears, used electronic equipment, and other activities unrelated to the unstated purpose of the legislation would not know if they are subject to its provisions. In other words, they could conceivably be deemed to be “person[s] dealing in secondhand goods” as defined in Section 812.049(5).
 

 Related to the question regarding the persons to whom the statutes apply is the question of what
 
 objects
 
 fall within the purview of the definition of “precious metals”. For example, would a pawn shop dealer be required to make a record of a precious metal transaction pursuant to Section 812.051(l)(b) if he purchased a piece of used electronic equipment, knowing that 36 percent of all gold, 24 percent of all platinum and 27 percent of all silver are used in electronics? Would he be required to retain the piece of equipment for 15 days pursuant to Section 812.051(5)? If one is to believe that Section 812.049(4) means what it says, the answer would be yes. Precious metals, according to the statute, means “any item . . . containing any gold, silver, or platinum.” This is not a hypertechnical point. Of course, the Court does not believe the Florida Legislature intended to include used electronic equipment within the scope of the definition of precious metals. Nevertheless, by the terms of the definition, a person buying any used item containing any trace of precious metal would be subject to arrest under the statutes if he failed to abide by the statutory restrictions in transacting the purchase.
 

 Another vagueness problem arising from the terminology employed in the statutes is the use of the phrases “all law enforcement officers” in Section 812.051(2) and “any law enforcement officer” in Section 812.051(5). Section 812.051(2) provides that the records required to be kept by the statutes “shall at all times be subject to inspection by all law enforcement officers .. . . ” Does this mean a secondhand precious metal dealer would be required to open up his records to a Deputy United States Marshal? An agent of the Federal Bureau of Investigation? Interpol? A vacationing New York policeman? An agent of the Florida Game and Freshwater Fish Commission? The list of absurd examples could go on for pages, and, under the statutes, they would all be permitted to inspect the records of any person or corporation required to maintain such records. The same holds true for Section 812.051(5), which requires dealers to produce items of precious metal to “any law enforcement officer upon request.”
 

 Yet another problem in the language of the Florida legislation is found in Section 812.051(l)(b), one of the record keeping provisions. The provision directs that each record of a precious metal purchase “shall” contain,
 
 inter alia,
 
 the “driver’s license number
 
 and
 
 one other identifying number” of the seller. Did the Florida Legislature really intend to exclude from the realm of precious metal transactions all persons who do not possess a driver’s license. One would think not. Yet, a review of the subsection immediately preceding Section 812.-051(l)(b), which specifies what records must be kept in connection with a purchase of
 
 metals
 
 as opposed to
 
 precious metals,
 
 leads
 
 *1024
 
 one to the conclusion that the legislature did consider with respect to that subsection the fact that many persons do not have driver’s licenses. Section 812.051(l)(a) requires that each record of a purchase of metal contain,
 
 inter alia,
 
 the “driver’s license number
 
 or
 
 other identifying number” of the seller. Section 812.051(l)(a) is thus framed in the disjunctive while Section 812.051(l)(b) is framed in the conjunctive, requiring that the precious metal purchase record contain a driver’s license number
 
 and
 
 another identifying number.
 

 Sections 812.051(2) and (3) present one of those “inexplicably contradictory commands” alluded to in
 
 Raley v. Ohio, supra.
 
 Section 812.051(2) requires that “[t]he records” required to be kept by the statutes be preserved for a period of three years after purchase. Section 812.051(3) requires that “the records” be submitted to the county sheriff within 24 hours of the purchase. That section also requires that “the records” be submitted to the municipal police department within 24 hours of purchase. There is no mention of photostatic copies. The obvious question is how can one set of records be preserved by the dealer and also turned over to two separate law enforcement agencies? The answer is that they cannot.
 

 In the final analysis, although the Court does not accept all of plaintiff’s arguments in connection with their vagueness challenge to the Florida legislation, the Court entertains serious doubt that the statutes set out with a “reasonable degree of certainty” what conduct is required or proscribed on behalf of those subject to their provisions.
 
 Boyce Motor Lines, Inc. v. United States, supra; Lanzetta v. United States, supra.
 
 Moreover, the ambiguous provisions of the statutes could operate to encourage arbitrary and erratic arrests and convictions.
 
 Grayned v. City of Rockford,
 
 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972);
 
 Thornhill v. Alabama, supra; Herndon v. Lowry,
 
 301 U.S. 242, 57 S.Ct. 732, 81 L.Ed. 1066. As such, there is a reasonable likelihood that plaintiffs will prevail on the merits in their vagueness attack upon Section 812.049 and Section 812.051.
 

 (2)
 
 Plaintiffs will suffer irreparable injury-
 

 Having found a strong likelihood that plaintiffs will succeed on the merits in their attack upon Section 812.049 and Section 812.051, the Court will consider the question of whether there is a substantial threat that plaintiffs will suffer irreparable harm in the absence of preliminary injunctive relief.
 
 Canal Authority of State of Florida v. Callaway, supra.
 
 489 F.2d at 572. For reasons that will become apparent, the Court is satisfied that plaintiff’s have demonstrated a substantial threat of irreparable injury.
 

 To begin with, in light of the Court’s previous discussion, it is likely that enforcement of the statutes against plaintiffs would operate to deprive them of their constitutionally protected right to be free from unreasonable searches and seizures, as well as their right to due process under the Fourteenth Amendment. This alone is sufficient to meet the required showing of irreparable harm.
 
 See, e.g., A Quaker Action Group v. Hickel,
 
 421 F.2d 1111, 1116 (D.C.Cir.1969);
 
 Keefe v. Geanakos,
 
 418 F.2d 359, 363 (1st Cir. 1969);
 
 Henry v. Greenville Airport Commission,
 
 284 F.2d 631, 633 (4th Cir. 1960);
 
 Battle v. Municipal Housing Authority for the City of Yonkers,
 
 53 F.R.D. 423, 429 (S.D.N.Y.1971);
 
 Lollis v. New York State Department of Social Services,
 
 322 F.Supp. 473, 483 (S.D.N.Y.1970).
 

 Additionally, plaintiffs allege that their businesses face virtual extinction if they are forced to comply with the legislation. This fear is not unfounded. As expounded upon earlier, the 15 day holding requirement could conceivably result in a termination of all aspects of plaintiffs’ interstate business. Moreover, the 15 day holding requirement will cast plaintiffs in the role of speculators totally at the mercy of the unpredictable world precious metal market. Should the price of gold, for example, commence a steep decline, for whatever reason, plaintiffs would be helpless to unload portions of their gold inventory. Plaintiffs also allege that enforcement of the statutes
 
 *1025
 
 will cause incalculable loss of customers and goodwill, and will increase their costs of doing business. Plaintiffs’ credible allegations that enforcement of Section 812.049 and Section 812.051 would result in the ruination of their businesses is an additional ground supporting a finding of irreparable harm.
 
 See, e. g., Doran v. Salem Inn,
 
 422 U.S. 922, 932, 95 S.Ct. 2561, 2568, 45 L.Ed.2d 648 (1975);
 
 Semmes Motors, Inc. v. Ford Motor Co.,
 
 429 F.2d 1197, 1205 (2d Cir. 1970);
 
 Paschall v. Kansas City Star Co.,
 
 441 F.Supp. 349, 357 (W.D.Mo.1977);
 
 see generally
 
 11
 
 A. Wright & C. Miller, Federal Practice and Procedure
 
 § 2948 (1973).
 

 (3)
 
 Injury to plaintiffs outweighs harm to defendants.
 

 The Court is also of the opinion that the threatened injury to plaintiffs outweighs any harm that defendants will suffer from the granting of injunctive relief.
 
 Canal Authority of State of Florida
 
 v.
 
 Callaway, supra,
 
 489 F.2d at 572. In fact, in light of the high probability that plaintiffs will prevail on the merits combined with the substantial threat that plaintiffs will suffer irreparable harm in the absence of injunctive relief, this is not even a close question. Certainly, the deprivation of plaintiffs’ constitutional rights and destruction of their livelihood is sufficient to tip the “balance of hardships” in plaintiffs’ favor.
 
 See, e.g., Packard Instrument Co. v. ANS, Inc.,
 
 416 F.2d 943, 945 (2d Cir. 1969);
 
 Hamilton Watch Co. v. Benrus Watch Co.,
 
 206 F.2d 738, 740 (2d Cir. 1953);
 
 Sinclair Refining Co. v. Midland Oil Co.,
 
 55 F.2d 42, 45 (4th Cir. 1932).
 

 (4)
 
 Granting the preliminary injunction will not disserve the public interest.
 

 The public undoubtedly has a strong interest in combatting and deterring crime. Nevertheless, there is a stronger public interest in protecting select groups of citizens from governmental harassment and wholesale deprivation of protected constitutional rights. If a governmental body were able to justify any action designed to advance law enforcement efforts on the ground that the action was taken in the public interest, the Constitution would be rendered meaningless; for virtually all individual protections contained in the Constitution could arguably be said to inhibit the public’s interest in the enforcement of its criminal laws. The Court finds that the public interest will be served, rather than disserved, by the granting of injunctive relief in favor of the plaintiffs herein.
 

 SEVERABILITY
 

 The final question for consideration is whether the preliminary injunction should apply to the entire legislation or only to those constitutionally offensive provisions elaborated upon in this opinion. In other words, the fact that a particular provision of a statute may be unconstitutional does not necessarily render the entire act void. Rather, whenever possible, the Court should give effect to the remaining portions of the statute under the rule of severability.
 
 See generally
 
 10
 
 Fla.Jur.2d
 
 § 98 (1979).
 

 As the Supreme Court expressed the rule in
 
 Cramp v. Board of Public Instruction of Orange County,
 
 137 So.2d 828 (1962):
 

 When a part of a statute is declared unconstitutional the remainder of the act will be permitted to stand provided: (1) the unconstitutional provisions can be separated from the remaining valid provisions, (2) the legislative purpose expressed in the valid provisions can be accomplished independently of those which are void, (3) the good and the bad features are not so inseparable in substance that it can be said that the Legislature would have passed the one without the other and, (4) an act complete in itself remains after the invalid provisions are stricken. [Citing cases].
 

 137 So.2d at 830.
 

 It should be apparent in light of the Court’s analysis that the instant legislation fails to meet the severability test. Once one removes the 15 day holding provision, the provisions allowing law enforcement officers to inspect records and items of precious metal upon request, and the provision requiring secondhand precious
 
 *1026
 
 metal dealers to submit all purchase records to the appropriate law enforcement agencies within 24 hours of the purchase, there is little of substance left in the legislation. Then there are, of course, the vagueness problems, the questionable validity of the prohibition upon transacting precious metal purchases with persons under 18 years of age, and the remaining four constitutional issues raised by plaintiffs that the Court felt it unnecessary to reach. In the final analysis, the Court is convinced that the legislation is so pervasively defective as to not be a proper subject for application of the severability rule. Consequently, the preliminary injunction will be applicable to the legislation as a whole.
 

 Wherefore, in accordance with the foregoing analysis, the Court will enter an order preliminarily enjoining the defendants herein, along with their agents and successors in office, from enforcing Florida Statutes § 812.049 and § 812.051 (1981) against either of plaintiffs.
 

 It will be so ordered.
 

 APPENDIX A
 

 Ch. 81-121 1981 REGULAR SESSION
 

 METALS — PURCHASE AND SALES CHAPTER 81-121
 

 COMMITTEE SUBSTITUTE FOR SENATE BILL NO. 54
 

 An Act relating to the purchase and sale of metals; amending s. 812.049, Florida Statutes, 1980 Supplement; defining “metals”; defining “precious metals”; defining “person dealing in secondhand goods”; amending s. 812.051, Florida Statutes, 1980 Supplement; requiring that records of purchases contain additional information; requiring that purchased items containing precious metals be retained in an unaltered condition in the county and be available for inspection; prohibiting the purchase of precious metals from minors; providing exemptions; providing a penalty; providing an effective date.
 

 Be It Enacted by the Legislature of the State of Florida:
 

 Section 1. Section 812.049. Florida Statutes, 1980 Supplement, is amended to read:
 

 812.049 Definitions
 

 As used in Sr — sst812.051 and 812.052:
 

 (1) “Junk” means old or scrap metals.
 

 (2) “Junk dealer” means any person who engages in the business of storing, keeping, buying, or selling junk.
 

 (3) “Metals” means any item containing any gold or-silver, any copper wire which is or can be used for transmission or distribution in a utility or communications system, and any railroad track and accessories. This act shall have no-applieation-exeept to these speoifio items.
 

 (41 “Precious metals” means any item previously sold at retail, containing any gold, silver, or platinum.
 

 (5K41 “Person dealing in secondhand goods” means every person who engages in the business of buying or selling precious metals of any kind.
 

 ' (6K5) “Scrap-metal processor” means a person maintaining and operating machinery and equipment used to process scrap metals to specifications prescribed by, and for sale to, mills and foundries.
 

 (7¥Q) “Foundry” means a person who uses, casts, or consumes metals of any kind.
 

 Section 2. Section 812.051, Florida Statutes, 1980 Supplement, is amended to read: 812.051 Records required of junk dealers, scrap-metal processors, persons dealing in secondhand goods, and foundries; holding period for precious metals; prohibiting precious metal purchases from minors
 

 (1) Every junk dealer, scrap-metal processor, person dealing in secondhand goods, or foundry shall keep a record of purchases of all metals as defined in s. 812.049(3) and precious metals as defined in s. 812.049(4). which record shall contain:
 

 (a) The name and address of each person from whom the metals are purchased, in-
 
 *1027
 
 eluding the signature of the person selling the same, together with the person’s driver’s license number or other identifying number.
 

 (bl The full name, residence address, home phone number, business phone number. place of employment, age, race, and sex of each person from whom the precious metals are purchased, including the signature of the person selling the same, together with the person’s driver’s license number and one other identifying number, and either a photograph of thumbprint of the seller.
 

 (c) (b) A general description of the item containing gold or silver or of the type of utility copper wire purchased, and a specific description of anv item containing gold, silver. or platinum, which description shall be accurate and as reasonably complete as the nature of the item permits and shall make reference to anv permanent marking on the item, including, but not limited to. brand-monogram. or hallmark.
 

 (d) (e) The estimated quantity of metals or precious metals purchased.
 

 (e) (4) The date of the purchase.
 

 (2) The records shall at all times be subject to inspection by all law enforcement officers and shall be preserved for a period of 3 years after purchase.
 

 (3) The records of purchases of precious metals gold or-silver, utility copper wire, or railroad track and accessories shall be submitted to the sheriff of the county and the municipal police department of the municipality in which the business is operated within 24 hours after purchase.
 

 (4) The provisions of subsection (3) shall not apply to scrap-metal processors purchasing metals from governmental entities, public utility companies, or railroad companies or from dealers certifying in writing that a report for the metals being purchased has previously been filed as required by this act. Violation of this provision shall be a misdemeanor of the- first degree, punishable as provided in S.-775.082, s. 775.083, or s. 775.-Qg/[
 

 (5) No articles containing precious metals shall be sold, melted, altered, or otherwise disposed of in anv manner bv anv person dealing in secondhand goods until 15 days have elapsed from the time the sheriff of the county or the municipal law enforcement agency of the municipality in which the business is operated has had the records of purchase supplied to him as required bv subsection (31. Said articles may not be transferred to another county during said 15-dav period. Said items shall be made available for inspection bv anv law enforcement officer upon request.
 

 (61 It shall be unlawful for anv person dealing in secondhand goods to knowingly buy, take, or receive bv wav of purchase or exchange anv precious metals from anv person under the age of 18 years.
 

 (7¥5) The provisions of this section shall apply only to purchases of metals as defined in s. 812.049(3) and precious metals as defined in s. 812.049(41. However, the provisions of this section shall not apply to the purchase of anv coin with an intrinsic value less than its numismatic value, or to the purchase of anv gold bullion coins, or to the purchase of anv gold, silver, or platinum bullion that has been assayed and is properly marked as to its weight and fineness, or to the purchase of anv coin which is mounted in anv jewelry setting any person whose primary business is dealing in gold-or silver coins or to any-person primarily engaged in the retail jewelry business-if such business is licensed pursuant to-law or -ordinance.
 

 (8)
 
 Anv person who violates the provisions of this section is guilty of a misdemeanor of the first degree, punishable as provided in s. 775.082. s. 775.083. or s. 775.-084.
 

 Additions in text indicated by underline: deletions by strikeouts
 

 Section 3. This act shall take effect October 1, 1981.
 

 Approved by the Governor June 23, 1981.
 

 Filed in Office Secretary of State June 23, 1981.
 

 [1]
 

 . Section 812.049 defines the terms used in Section 812.051, which sets forth the substantive provisions of the challenged legislation. Copies of the statutes are attached hereto as Appendix A.
 

 [2]
 

 . Because the primary purpose of the legislation is the regulation of precious metal dealers, the Court will focus upon those aspects of the statutes. Their coverage, however, is not so limited. Portions of the legislation also apply to junk dealers, scrap-metal processors and foundries who purchase certain non-precious metals, i.e., any copper wire capable of being used for transmission or distribution in a utility or communications system and any railroad track or accessories.
 

 [3]
 

 . Plaintiff Mid-Fla. Coin Exchange, Inc. is a Florida corporation, having its principle place of business in Crystal River, Citrus County, Florida. Plaintiff Antonio Arjibay, Jr. is an individual, doing business in Lake County, Florida.
 

 [4]
 

 . Had the defendants Graffis and Simpson arrested either of the plaintiffs for a violation of
 
 *1007
 
 the statutes prior to institution of this action, it is questionable whether they would have been liable under Section 1983, provided they acted in good faith in accordance with their sworn duty to enforce the laws of the State of Florida. In
 
 Pierson v. Ray,
 
 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), the Supreme Court recognized a limited good faith immunity defense applicable in Section 1983 actions against a police officer who has made an arrest under a statute that is later found to be unconstitutional. 386 U.S. at 557, 87 S.Ct. at 1219. The cornerstone requirement of the defense is that the officer acted in good faith in making the arrest, that is, with probable cause, believing that the statute was valid. 386 U.S. at 555, 87 S.Ct. at 1218;
 
 Joseph v. Rowlen,
 
 402 F.2d 367, 370 (7th Cir. 1968);
 
 Sexton v. Gibbs,
 
 327 F.Supp. 134, 141 (N.D.Tex.1970).
 

 The defense constitutes a common sense recognition of the fact that a police officer cannot realistically be expected to evaluate the constitutionality of each state statute he is charged with enforcing. Indeed, it would ordinarily be somewhat presumptuous for a police officer to take it upon himself to question the validity of a statute that has been duly enacted by the legislature and governor of his state. As the Supreme Court observed in
 
 Pierson:
 

 A
 
 policeman’s lot is not so unhappy that he must choose between being charged with dereliction of duty if he does not arrest where he has probable cause, and being mulcted in damages if he does. Although the matter is not entirely free from doubt, the same consideration would seem to require excusing him from liability for acting under a statute he reasonably believed to be valid that was later held unconstitutional, on its face or as applied.
 

 386 U.S. at 555, 87 S.Ct. at 1218. Of course, once a law enforcement officer is put on notice that a statute is unconstitutional, any further attempt to enforce it could very well subject the officer to liability under Section 1983.
 

 [5]
 

 . This is not the type of preliminary injunction case in which the Court must be overly wary in considering the likelihood that plaintiffs will prevail on the merits, taking careful steps not to prejudge too much, too soon. Whereas the ultimate decision in most cases teeters on the edge of fiercely disputed questions of fact which have not been fully presented at the preliminary injunction stage of the proceedings, resolution of the instant case depends almost entirely upon questions of law. In practical effect, the Court’s decision on plaintiffs’ application for preliminary injunctive relief will be akin to a declaratory judgment that the challenged legislation is unconstitutional. As was pointed out in the discussion of abstention,
 
 *1008
 

 supra,
 
 the Supreme Court has acknowledged that “[o]rdinarily, .. . the practical effect of the two forms of relief will be virtually identical . . .
 
 Samuels v. Mackell, supra,
 
 401 U.S. at 73, 91 S.Ct. at 768.
 

 [6]
 

 . The Supreme Court has repeatedly recognized the paramount nature of any exercise of the federal commerce power. See,
 
 e.g., Simpson v. Shepard,
 
 230 U.S. 352, 33 S.Ct. 729, 57 L.Ed. 1511 (1913), wherein the Court stated that:
 

 [t]here is no room in our scheme of government for assertion of state power in hostility to the authorized exercise of Federal power. The authority of Congress extends to every part of interstate commerce, and to every instrumentality or agency by which it is carried on; and the full control by Congress of the subjects committed to its regulation is not to be denied or thwarted by the commingling of interstate and intrastate operations.
 

 230 U.S. at 399, 33 S.Ct. at 739.
 

 [7]
 

 . Although a state undoubtedly has the authority, pursuant to its police power, to enact legislation designed to protect the health, safety and well-being of its citizens, it is clear that a state may not justify an otherwise impermissible burden upon interstate commerce by “simply invoking the convenient apologetics of the police power.”
 
 Southern Pacific Co. v. Ariz.,
 
 325 U.S. 761, 779-80, 65 S.Ct. 1515, 1525-26, 89 L.Ed.
 
 1915
 
 (1945),
 
 quoting Kan. City S. Ry. v. Kaw Valley Drainage Dist.,
 
 233 U.S. 75, 79, 34 S.Ct. 564, 565, 58 L.Ed. 857 (1914).
 

 [8]
 

 . In light of the fact that the Court finds the 15 day holding requirement to be violative of the Commerce Clause, it is unnecessary to reach plaintiffs’ claim that the provision is also invalid under the Supremacy Clause,
 
 U.S.Const.
 
 art. 6, cl. 2.
 

 [9]
 

 . Section 812.051(6) makes it “unlawful for any person dealing in secondhand goods to knowingly buy, take, or receive by way of purchase or exchange any precious metals from any person under the age of 18 years.” This subsection, of course, flies directly in the face of Public Law 93-110, as amended by Public Law 93-373, which provides that no law may be construed as prohibiting “any person” from purchasing, holding or otherwise dealing in gold.
 

 Moreover, even in the absence of the federal legislation it is questionable whether this provision could withstand constitutional scrutiny. Minors are “persons” under the federal Constitution and have certain fundamental rights which a state must respect.
 
 Tinker v. Des Moines Independent Community School Disk,
 
 393 U.S. 503, 511, 89 S.Ct. 733, 739, 21 L.Ed.2d 731 (1969). Although directed at the secondhand precious metal dealers, the statutory prohibition implicates the associational rights of minors guaranteed by the First Amendment. The right to associate freely is not limited to political associations, “but includes associations for social, legal, or
 
 economic
 
 purposes.”
 
 Johnson v. City of Opelousas,
 
 658 F.2d 1065 at 1072 (5 Cir., 1981) (Emphasis added). Defendants have not articulated any important state
 
 *1012
 
 interest that would justify the restriction the statute imposes upon the rights of minors to sell or exchange items of precious metals and the Court is unable to divine one on its own.
 
 See Aladdin’s Castle, Inc. v. City of Mesquite,
 
 630 F.2d 1029, 1041 (5th Cir. 1980).
 

 It is not necessary, however, to decide this question, but it serves to demonstrate the overall infirmity of the Florida statutes, thereby strengthening the likelihood that plaintiffs will prevail on the merits.
 

 [10]
 

 . Because the alternative ground for finding state legislation violative of the Commerce Clause depends upon mixed questions of law and fact rather than pure questions of law, it is of less certain applicability to the instant cause than that already discussed. Nevertheless, as noted, plaintiffs’ factual allegations stand unrebutted at the present time and will be taken as true for the purpose of ruling upon their motion for preliminary injunction.
 

 [11]
 

 . Section 812.051(4) provides that the provisions of Section 812.051(3) are not applicable to scrap-metal processors purchasing metals from governmental entities, public utility companies, or railroad companies or from dealers who certify in writing that a report for the metals being purchased has previously been filed pursuant to the statute.
 

 [12]
 

 . The petitioner in
 
 Colonnade
 
 was owner of a catering establishment. While attending a party on petitioner’s premises, a federal revenue agent noticed a possible violation of the federal excise tax law in connection with the liquor that was being served there. Other federal agents later returned to petitioner’s establishment and demanded access to a locked storeroom. Petitioner refused and the agents thereupon proceeded to break the lock and enter the storeroom. They removed certain bottles of liquor they suspected of being refilled in violation of 26 U.S.C. § 5301(c).
 

 [13]
 

 . Florida Statutes § 901.15 (1979) authorizes a peace officer to arrest a person without a warrant when the person has committed a felony or a misdemeanor in his presence.
 

 [14]
 

 . The Court notes that the language of Section 812.051(5) does not limit the items that “shall be made available for inspection” to those purchased within the 15 day period preceding the request, although that is one interpretation. Rather, the sentence dictating that “Said items” shall be made available for inspection appears to relate back to the first sentence beginning with the inclusive phrase “No articles containing precious metals ... . ”
 

 [15]
 

 . A disturbing aspect of these statutes is the fact that, as plaintiffs point out in their memorandum, inherent in the statutes is a legislative suspicion that the secondhand precious metal dealers are themselves engaging in illegal activities. In other words, the statutes are aimed not simply at uncovering the identity of the thieves themselves, but at unscrupulous precious metal dealers who knowingly function as outlets for stolen goods. Consequently, inasmuch as the object of the statutory “search” procedure could also be the object of a criminal investigation, it is arguable that it would be necessary not only to obtain a search warrant, but to test the warrant application against the stringent standard of probable cause applicable in criminal cases. As the Supreme Court stated in
 
 Camara v. Municipal Court, supra:
 

 [I]n a criminal investigation, the police may undertake to recover specific stolen or contraband goods. But that public interest would hardly justify a sweeping search of an entire city conducted in the hope that these goods might be found. Consequently, a search for these goods, even with a warrant, is ‘reasonable’ only where there is ‘probable cause’ to believe that they will be uncovered in a particular dwelling.
 

 387 U.S. at 535, 87 S.Ct. at 1734. Under the Florida Statutes, even if the police suspect a secondhand precious metal dealer of operating as a fence, they can enter his premises, without a warrant, and demand that he produce items of precious metals that could be used as evidence against him in a criminal trial for grand theft.
 

 [16]
 

 . As Justice Jackson observed in his dissenting opinion in
 
 Brinegar v. United States,
 
 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949);
 

 [W]e must remember that the authority which we concede to conduct searches and seizures without warrant may be exercised by the most unfit and ruthless officers as well as by the fit and responsible, and resorted to in case of petty misdemeanors as well as in the case of the gravest felonies.
 

 338 U.S. at 182, 69 S.Ct. at 1314.
 

 [17]
 

 . Under Florida law, a first degree misdemeanor carries a maximum penalty of one year imprisonment and/or a $1,000 fine. Florida Statutes § 775.082(4)(a), § 775.083(l)(d) (1979).